Robert E. PAINE, III, Appellant,

v.

Thomas L. CARTER et al., Appellees.

No. 484.

Court of Civil Appeals of Texas,
Houston (14th Dist.).

July 21, 1971.

Rehearing Denied Aug. 11, 1971.

Fred W. Moore, Harry J. Lawson, Houston, for appellant.

Alfred H. Ebert, Jr., Andrews, Kurth, Campbell & Jones, Houston, for appellees.

BARRON, Justice.

This is a suit on a contract executed April 24, 1961 by Thomas L. Carter, Artex Construction Company, Inc., Rockland Corporation, Alex W. Head, Ernest W. Bartlett, Jr., and Fred W. Moore. The plaintiff, Paine, sued to collect a $20,000.00 obligation plus interest and attorney's fees. A $30,000.00 note payable to the First City National Bank of Houston had been signed earlier by Ernest W. Bartlett, Jr. with Paine as co-signer. The note was for the purpose of Bartlett's purchase of 200 shares of stock in Artex Construction Company, Inc., and he became President of said corporation prior to April 24, 1961 and an active participant therein. The contract in question was entered into in settlement of litigation arising out of certain road projects in the Republic of Argentina. The plaintiff, Paine, makes his claims in the present litigation as assignee of the rights of Ernest W. Bartlett, Jr., one of the parties to this settlement contract. Paine paid the note to the bank. Bartlett, through whom Paine claims, along with the defendant, Thomas L. Carter and two other persons, became interested in the Argentine road projects in the late 1950's and decided to submit bids for the construction of roads in Argentina. In connection with the submission of these bids, the defendant, Artex Construction Company, Inc., a Texas corporation (Artex), was formed in 1958, and upon the acceptance of the bids by the Argentine Government Artex entered into contracts for the construction of two roads. At that time Artex had four share holders, Bartlett, Carter and two others. Since it was necessary for Artex to post performance bonds in the nature of bank guaranties with the Argentine Government, and since Artex did not otherwise have the financial resources to make such bonds, Carter personally guaranteed the obligations of Artex on such performance bonds.

By 1961 the two road projects were proceeding poorly, and disputes had arisen among the Artex shareholders which, in the case of Carter and Bartlett, had resulted in litigation between them. It had also become necessary for Artex informally to associate a corporation by the name of Paul Hardeman, S. A., a Venezuelan corporation, as joint venturer to assist in the attempt to complete these projects. In April of 1961, the litigation between Bartlett and Carter was settled by the contract dated April 24, 1961 and as a result thereof, Bartlett severed all connections as an officer and shareholder of Artex, and Carter became the sole shareholder of the corporation. Under the terms of this written settlement contract, in evidence in this case, Carter, among other things, paid $10,000.00 to the First City National Bank to be applied on the $30,000.00 note which Bartlett owed to that bank. Carter was further obligated to pay to that same bank for the benefit of Bartlett $1.00 out of every $6.00 from the "first moneys made available to Carter by Artex Construction Company, Inc., whether by remittance of cash to apply upon the obligations of Artex Construction Company, Inc. to Thomas L. Carter, by reorganization, dividends, dis-

solution, salary, sale or otherwise" until the sum of $20,000.00, plus 6% per annum on the declining balance had been paid to the bank for Bartlett's benefit. Another clause in the settlement contract of significance to this suit provided that "so long as Thomas L. Carter is in control of Artex Construction, Inc. * * * whenever the clear working capital of said Artex Construction Company, Inc., is in excess of $200,000.00, it shall be considered that the working capital in excess of such sum is available to Thomas L. Carter by way of repayment of the obligations of Artex Construction Company, Inc., to Thomas L. Carter", thus requiring Carter to pay $1.00 out of every $6.00 of such excess working capital to the bank for Bartlett's benefit under the contract provision first quoted above.

After the April 24, 1961 settlement contract was signed, Carter continued to advance large sums of money to Artex for use in the corporation's attempts to complete the road projects. Under the joint venture arrangement, Hardeman, S. A. also advanced considerable sums to the projects in order to see them through. In addition, a third road project was undertaken by the Artex-Hardeman, S. A. joint venture and Carter was once again required personally to guarantee the performance bond obligation to the Argentine Government on the third road project. These guarantees were eventually released.

On August 21, 1961, the joint venture agreement was formalized in writing whereby the two Artex jobs, Acceso Norte II, and Rosario, and the Paul Hardeman, S. A. job, Acceso Norte III, were to be completed as a joint venture composed of Paul Hardeman, S. A. and Artex, and the testimony shows, in spite of an error in the written agreement, that Hardeman, S. A. was to be the managing venturer and in complete control of all activity. It was also agreed in writing that from the first $600,000.00 of cash or cash and equipment,

Hardeman, S. A. would receive fifty percent and Artex would receive fifty percent, and from the second $600,000.00 Hardeman, S. A. would receive one-third and Artex would get two-thirds. Any balance remaining would then be distributed to Artex, and if it became necessary for Hardeman and Artex to choose first, Hardeman, S. A. would choose first. By late 1963 it was becoming apparent that because of high costs, excessive inflation in Argentina and devaluation of the Argentine peso, the Artex-Hardeman joint venture was facing severe losses on these road projects. In an attempt to recoup some of these losses Hardeman, S. A., Carter and Artex entered into an agreement dated October 30, 1963 for the possible joint venturing of future projects in South America, and Carter supplied to Hardeman, S. A. a $400,000.00 letter of credit to indicate his financial ability to undertake such new projects. In 1964, Hardeman, S. A. did secure a project in Bolivia and Carter advanced $300,000.00 to Hardeman under the assumption that he or Artex would become a joint venturer in this Bolivian project. Thereafter Hardeman, S. A. refused to accept Carter or Artex, for reasons good or bad, as a joint venturer in Bolivia, refused to return the $300,000.-00 advanced by Carter, and as Carter put it, "stole" the Artex construction equipment from Argentina when the three projects there were finally completed, took the Artex equipment to Bolivia without the knowledge or consent of Artex, and thereafter apparently went bankrupt. Additional litigation ensued in the United States District Court in Houston between Artex, Carter, Hardeman and one of the suppliers of the equipment taken by Hardeman to Bolivia. This federal court litigation was terminated in 1969 by judgment.

At the time of dissolution of Artex in December, 1967, Carter testified that he received as trustee only $2.01 back from Artex. He testified that the physical assets of the corporation were taken by

Hardeman, S. A. as above stated, and that no money, property or equipment of any kind were received by him with the exception of the above small sum. He further testified that there was nothing with which to pay plaintiff on dissolution. Carter steadfastly denied that he had secreted any money or property during this whole affair, and that he had lost personally by advances, loans and financing of Artex Construction Company, Inc. the sum of $2,269,000.00 and the corporation was in debt at time of dissolution in the approximate sum of $1,750,000.00 additionally.

Vernon Garrett, a partner in the accounting firm of Arthur Andersen & Company, testified that from the information furnished him, Artex never had a clear working capital of $200,000.00 but instead always had a minus working capital. He defined working capital as the excess of current assets over current liabilities, and that current liabilities are those obligations and debts of the company which mature within one year or within the operating business cycle of the company. For instance, as of December 31, 1964 the working capital of Artex was a minus of $1,821,669.00, and a minus figure was testified to at various times and stages of these projects.

Plaintiff introduced into evidence many documents in an attempt to show that Carter had "available" to himself from Artex sufficient funds to pay the $20,000.00 obligation to Paine, and among those documents was a sworn statement made by Carter on June 15, 1964 in which Carter stated that receipts earned by Artex Construction Company, Inc. as a result of its performance of road construction contracts in the Republic of Argentina amounted to a sum in excess of $10,000,000.00 from April 30, 1961 through April 30, 1963. However, it was shown that construction costs, labor, gasoline, and general and administrative expenses exceeded the receipts, and Carter testified that the $10,-000,000.00 figure above was a gross earning and that the costs and expenses far exceeded the earnings and receipts. This testimony was corroborated in various phases by Vernon Garrett.

The evidence shows that Thomas L. Carter was the sole stockholder of Artex with the possible exception that minute interests were held by two other persons; that Carter controlled the corporation and that there were no meetings of stockholders or directors after July 14, 1959, almost two years before Bartlett left the corporation.

The trial court submitted four special issues to the jury. The first issue inquired as to what sum of money was received by Artex from the Argentine Government for construction of roads which was made available to Carter by Artex after April 24, 1961. The trial court gave the following instruction in connection with issue number 1:

"In answering the foregoing Special Issue, you will take into consideration only remittances of cash, by Artex Construction Company, Inc. to Thomas L. Carter, if any, to apply on the obligations of Artex Construction Company, Inc. to Thomas L. Carter by reorganization, dividends, dissolution, salary, sale or otherwise."

The jury answered "$2.01", in favor of defendants.

The second special issue inquired whether Artex had a clear working capital in excess of $200,000.00 after April 24, 1961, and the term "working capital" was properly defined. The jury's answer was "We do not.", in favor of defendants.

Special issue number 3, inquiring by what amount the clear working capital exceeded the sum of $200,000.00, conditionally submitted, was not answered.

Special issue number 4, inquired whether Thomas L. Carter was the alter ego of

Artex Construction Company, Inc. The term "alter ego" was properly defined. The jury's answer was "We do.", finding that the alter ego arrangement did exist.

The trial court, on the verdict of the jury, rendered a take nothing judgment in favor of defendants, Carter and Artex Construction Company, Inc. Thus this appeal was perfected by Robert E. Paine, III, as appellant.

We shall consider only that evidence which is most favorable to the findings of the jury and the judgment of the trial court, as we have done in the summary of facts above, and we shall honor the rule that it is in the province of the jury to resolve conflicts and inconsistencies in the testimony of a witness or between witnesses. See Biggers v. Continental Bus System, 157 Tex. 351, 303 S.W.2d 359, 365.

■ Appellant has brought forward twenty-seven points of error. His first group of points deals with the trial court's refusal to submit to the jury 19 special issues requested by him and refused by the trial court. Appellant, through his able counsel in oral argument before this court, however, candidly concedes that such alleged errors of the trial court may be of no importance and that such requested special issues may be evidentiary or not controlling. We have carefully considered each requested special issue, and we are of the opinion that such special issues are evidentiary or immaterial and that they were properly refused by the trial court. We are further of the opinion that the trial court submitted, at least in its first three special issues, the controlling issues in this case. For instance, at least three special issues were requested by appellant in lieu of special issue number 1 as submitted by the trial court, which requested issues would have carved special issue number 1 into at least three issues, by inquiring separately whether Artex made available to Carter money for the years 1961, 1962 and 1963. Other requested issues were either immaterial in view of the charge given, or constituted various phases or different shades of the special issues actually submitted by the trial court. See Southern Underwriters v. Schoolcraft, 138 Tex. 323, 158 S.W.2d 991, 993, op. adopted; Wilkinson v. Southern Farm Supply Association, 409 S.W.2d 435, 437–438 (Tex. Civ.App.), writ ref., n. r. e. Only the controlling issues in the case need be submitted. Rule 279 Texas Rules of Civil Procedure; Hodges, Special Issue Submission in Texas, Sec. 35, p. 100. Here only two questions related to the requested issues need be answered, i. e., how much money did Artex make available to Carter, if any, and by how much, if any, did the working capital of Artex exceed $200,000.00. In this type of case, a contract case and not a personal injury case, fewer and much broader issues are approved. See City of Houston v. Lurie, 148 Tex. 391, 224 S.W.2d 871, 876; Howell v. Howell, 147 Tex. 14, 210 S.W.2d 978, 980; Fyfe Cement & Gravel Company v. Mathis, 310 S.W.2d 770, 773 (Tex.Civ.App.), writ ref., n. r. e. We think the first three issues of the charge of the court were correct and that the controlling issues were submitted to the jury. Appellant's related points of error are overruled.

Appellant, in effect, contends that since the jury found in its answer to special issue number four that Carter was the alter ego of Artex Construction Company, Inc., money was available to Carter at all times; that the corporate existence of Artex offered Carter no protection and that appellant's debt should have been paid by Carter whenever money was forthcoming regardless of expenses owed and incurred by the corporation. It will be noted that the jury found that Carter was the alter ego of Artex and not the reverse thereof. Appellees contend in answer to such complaint that there is no law in Texas which holds that an individual can be the alter ego of

a corporation which he controls through stock ownership. We think it makes little or no difference in this case, but it has been held in Texas that an individual could be the alter ego of a corporation. See Gill v. Smith, 233 S.W.2d 223 (Tex.Civ. App.), writ ref., n. r. e.; Texas Electric Service Co. v. Moxley, 157 S.W.2d 726 (Tex.Civ.App.), no writ. In either event the corporate "fiction" will be disregarded under ordinary circumstances. Appellant contends that it was obvious that Carter completely dominated and controlled Artex and kept it alive by continual injections of large amounts of cash, and when he thought it desirable, he made contracts for the corporation at his pleasure. However, under the undisputed facts of this case we hold that the jury's answer to special issue number four is immaterial, and that appellant, Paine, who claims under Bartlett, the former President of Artex and a participating director and stockholder in the corporation, is precluded in law or is estopped to claim the ordinary effects of the jury's finding on the issue.

The duties, liabilities, conditions and contingencies were made by the written contract of April 24, 1961 in the present case. Bartlett, Artex and Carter were parties to such contract, and the contract recognizes and assumes the separate existence of Artex and Carter. Bartlett had been President of Artex as above stated, and the corporation had been conducted in the same manner prior to Bartlett's disassociation with Artex, on April 24, 1961, as it was conducted thereafter by Carter. Bartlett chose to deal with both Artex and Carter in their separate legal capacities since they both signed the contract and had different duties and responsibilities thereunder. Bartlett knew full well of the separate existence and separate capacities of Artex and Carter. In fact, the April 24, 1961 contract contemplated that Carter would "control" Artex and imposed certain duties on Carter so long as he maintained such control. The fact that the agreement of

joint venture was made with Paul Hardeman, S. A., whereby Hardeman was to manage the venture and was to receive fifty percent of the first $600,000.00 of cash and equipment, one-third of the second $600,000.00, and was to choose first, could properly be an arrangement brought about by business necessity. It was not necessarily, as appellant contends, a fraudulent arrangement to defeat appellant's rights. The jury and trial court impliedly found it was not such arrangement.

The cases in Texas have made it clear that in order for the doctrine of alter ego to apply, there must be an attempted use of a corporate vehicle in a fraudulent manner or in a manner which would ordinarily defraud an unsuspecting or good faith third party. Moreover, where a party knows of the relationship between a corporation and its shareholder and chooses freely and voluntarily to deal with them in their respective capacities, he is estopped to claim that the corporation is the alter ego of the individual (or the reverse thereof). Appellees properly pleaded estoppel in this connection. See 22 Tex.Jur.2d, p. 662; Gress v. Gress, 209 S.W.2d 1003, 1006–1007 (Tex.Civ.App.) writ ref., n. r. e. The appellant here is legally bound by the written contract as well as by the undisputed testimony as to knowledge of the corporate structure and the separate existence of the parties. Bell Oil & Gas Co. v. Allied Chemical Co., 431 S.W.2d 336 (Tex.Sup.); Hubbard v. Capital Southwest Corp., 448 S.W.2d 571 (Tex.Civ.App.), no writ; George v. Houston Boxing Club, Inc., 423 S.W.2d 128 (Tex.Civ.App.), writ ref., n. r. e.; Minchen v. Van Trease, 425 S.W.2d 435, 438 (Tex.Civ.App.), writ ref., n. r. e. And see State v. Swift & Co., 187 S.W.2d 127, 131–132 (Tex.Civ.App.), writ ref. In Bell Oil & Gas Co., supra, the general rule in this state was quoted:

" 'Courts will not disregard the corporation fiction and hold individual officers, directors or stockholders liable on

the obligations of a corporation except where it appears that the individuals are using the corporate entity as a sham to perpetrate a fraud, to avoid personal liability, avoid the effect of a statute, or in a few other exceptional situations.' "

On this question the evidence does not conflict, and the appellant as assignee of Bartlett is legally precluded from claiming. that Carter was the alter ego of the corporation in violation of the basic contract in this case, an arrangement which was agreed to by all parties with full knowledge of the facts. Bartlett knew that there had been no formal meeting of directors and stockholders for a period of approximately 21 months prior to the settlement contract of April 24, 1961. The jury's finding as to special issue number four has no legal significance and is immaterial to the rights of the parties in this case. Appellant's contention is overruled.

■ Appellant further contends the trial court erred in failing to define the word "available" in accordance with the definition submitted by appellant. Rule 277, T.R.C.P., requires only that the court submit such explanatory instructions and such definitions of legal terms as shall be necessary to enable the jury to properly pass upon and render a verdict on the issues. The contract of April 24, 1961, in effect, contained its own definition of the term "available", and it is the definition which substantially was used by the trial court in special issue number one. Having used the words of the contract, practically verbatim, in describing under what circumstances money would be considered to have been made "available" to Carter, the trial court substantially complied with Rule 277, T.R.C.P.

Claim is further made by appellant that the three bank guaranties made to the Argentine Government which Carter personally guaranteed because Artex did not otherwise have the financial resources to make the performance bonds or guaranties, somehow caused Carter to gain in money or property the amount of the bank guaranties when they were released. We hold that the release of the bank guaranties amounted to no receipt of money or property. As Carter testified, he had never paid anything on them and when they were released he was given nothing for them. He had put out nothing, and when they were released he got nothing. They were mere contingent liabilities of Carter.

■ While the jury was deliberating the foreman sent a note to the trial judge stating that the jury's proposed answer to special issue number one was "unknown". The Foreman inquired whether such answer was acceptable. The judge answered by note in writing that "You will be guided by the charge of the Court, that is the issues, instructions and definitions contained therein." The jury eventually answered issue number one by stating "$2.01". Also in his motion for new trial, appellant declares that the court gave an erroneous instruction to the jury concerning figures placed upon a blackboard during his jury argument. However, there is no evidence of any such instruction having been given in the court's charge, in the statement of facts or in the reporter's transcription of the jury argument. The trial court has certified that no instructions were given with reference to the blackboard except as may be shown in one of those three portions of the record. Appellant has made no bill of exception as to this claimed occurrence. Under the circumstances there is nothing for this court to review. Claims of misconduct by the judge will not be reviewed on appeal without a bill of exception, statement of facts showing it, or a certificate by the trial court of the correctness of the complaint. See 4 Tex.Jur. 2d, Sec. 499, p. 31; Bailey v. Moseley, 77 S.W.2d 603, 605 (Tex.Civ.App.), writ dism'd.

■ Appellant contends that two of his allegedly important exhibits were not delivered to the jury room. Five jurors were

called by appellant to give testimony at the hearing on motion for new trial. The Foreman of the jury testified that there was no discussion among the jurors about not being able to find any exhibits, and that he could not recall being unable to find anything that they wanted. No juror ever stated that he was unable to find an exhibit nor did any juror ask the Foreman to request other exhibits from the court. Whether the jurors made use of the exhibits during deliberations is not a subject for investigation by the trial court or by this court on appeal since to do so requires delving into the mental processes of the jurors. See Sproles Motor Freight Lines v. Long, 140 Tex. 494, 168 S.W.2d 642 (Tex.Sup.)

The evidence is ample in the record in this case to show that no money was available to Carter by Artex Construction Company, Inc. as contemplated by the written contract in evidence. The verdict of the jury is supported by credible evidence on the controlling issues.

The judgment of the trial court is therefore affirmed.

### On Motion for Rehearing

On motion for rehearing appellant denies that he conceded in oral argument before this Court that the trial court's refusal to submit to the jury 19 special issues requested by appellant and refused by the trial court was, in effect, harmless. Appellant states that his correct statement to this Court was that the jury's answer to special issue number 4 which found that Carter was the alter ego of Artex Construction Company, Inc., was the central and important point in this case.

In view of appellant's statements on motion for rehearing, we withdraw our statement in the original opinion regarding appellant's concession. We have, however, as indicated by our opinion, fully considered the above matters, and we remain convinced that the trial court did not commit reversible error in refusing to submit the requested special issues.

Moreover, after further consideration, we remain convinced that the jury's answer to special issue number 4, whether supported by evidence or not (which we do not decide), has no legal significance under the facts of this case and is, therefore, immaterial. The contract recognizing the status of the parties was the very basis of appellant's cause of action. See C. & R. Transport, Inc. v. Campbell, 406 S.W.2d 191, 194–195 (Tex.Sup.1966).

We have carefully considered appellant's motion for rehearing, and it is respectfully overruled.